FLOYD, Circuit Judge:
 

 Appellant Irek Hamidullin appeals his conviction for, among other things, providing and conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A, and conspiring and attempting to destroy an aircraft of the United States Armed Forces, in violation of
 
 18 U.S.C. § 32
 
 . Hamidullin contends that the district court erred in concluding that he was not entitled to combatant immunity under the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949,
 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Third Geneva Convention" or "Convention"), and that he did not qualify for the common law combatant immunity defense of public authority. Hamidullin also challenges his conviction for violating
 
 18 U.S.C. § 32
 
 , arguing that § 32 does not apply to otherwise lawful military actions committed during armed conflicts.
 

 We affirm, concluding that Hamidullin is not entitled to combatant immunity. We also conclude that § 32 clearly applies.
 

 I.
 

 Irek Hamidullin is a former Russian Army officer affiliated with the Taliban and Haqqani Network. He was captured by the Afghan Border Police and American soldiers in the Khost province of Afghanistan in 2009 after he planned and participated in an attack on an Afghan Border Police post at Camp Leyza. He was taken into U.S. custody and held in U.S. facilities in Afghanistan. He was later indicted in the Eastern District of Virginia for acts associated with the attack, first in a twelve-count indictment and later in a fifteen-count second superseding indictment. The charges against him included providing and conspiring to provide material support to terrorists, conspiring and attempting to destroy an aircraft of the United States Armed Forces in violation of
 
 18 U.S.C. § 32
 
 , conspiring and attempting to kill an officer or employee of the United States, and conspiring to use a weapon of mass destruction.
 

 Prior to trial, Hamidullin moved for dismissal of the second superseding indictment on the grounds that he qualified for combatant immunity pursuant to the Third Geneva Convention and common law. Hamidullin also moved to dismiss his
 
 18 U.S.C. § 32
 
 charge, arguing that the statute was not intended to apply to lawful military actions.
 

 The district court held an evidentiary hearing on Hamidullin's motions at which experts testified as to the applicability of the Third Geneva Convention and laws of war in Hamidullin's circumstance and as to the structure and practices of the Taliban and the Haqqani Network. Thereafter, the court denied Hamidullin's motion to dismiss. The district court assumed without deciding that in 2009, when the alleged acts took place, the conflict in Afghanistan was an international armed conflict and determined that Hamidullin was not a lawful combatant because neither the Taliban nor the Haqqani Network fell within any of the categories of lawful combatants listed in Article 4 of the Third Geneva Convention. Thus, the district court concluded that, as a matter of law, Hamidullin was not entitled to combatant immunity under the Third Geneva Convention or common law and precluded him from presenting this defense at trial. The district court also determined that the plain language of
 
 18 U.S.C. § 32
 
 embraced unlawful acts in a combat zone.
 

 In August 2015, Hamidullin was convicted by a jury on all charges and sentenced to multiple life sentences. On appeal, Hamidullin argues that the district court erred in (1) holding that his prosecution was not barred by the doctrine of combatant immunity, as articulated by the Third Geneva Convention and common law, and (2) determining that
 
 18 U.S.C. § 32
 
 applied to his actions. On June 23, 2017, this Court ordered supplemental briefing to address whether the district court possessed jurisdiction to decide, in the first instance, whether Hamidullin qualifies for combatant immunity under the Third Geneva Convention. In particular, we requested briefing on whether the district court's jurisdiction was affected by Army Regulation 190-8-which implements international law relating to detention during armed
 conflicts. In response, Hamidullin argues that Army Regulation 190-8 requires that this Court vacate his conviction and remand with instructions that he be transferred to the U.S. military for treatment in accordance with Army Regulation 190-8.
 

 II.
 

 Hamidullin argues he is entitled to combatant immunity under various theories. Accordingly, we begin with a brief discussion of the doctrine of combatant immunity. Combatant immunity is rooted in the customary international law of war and "forbids prosecution of soldiers for their lawful belligerent acts committed during the course of armed conflicts against legitimate military targets."
 
 United States v. Lindh
 
 ,
 
 212 F.Supp.2d 541
 
 , 553 (E.D. Va. 2002). Instead, "[b]elligerent acts committed in armed conflict by enemy members of the armed forces may be punished as crimes under a belligerent's municipal law only to the extent that they violate international humanitarian law or are unrelated to the armed conflict."
 

 Id.
 

 In order to invoke combatant immunity, a combatant must also be lawful, as described below.
 
 Ex parte Quirin
 
 ,
 
 317 U.S. 1
 
 , 31,
 
 63 S.Ct. 2
 
 ,
 
 87 L.Ed. 3
 
 (1942) ("Lawful combatants are subject to capture and detention as prisoners of war by opposing military forces. Unlawful combatants are likewise subject to capture and detention, but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.").
 

 The current doctrine of combatant immunity is codified in the Third Geneva Convention. The Third Geneva Convention is one of four international agreements drafted in the wake of World War II to govern the status and treatment of wounded and captured military personnel and civilians in wartime.
 
 [1]
 

 See
 
 Adriana Sinclair,
 
 Geneva Conventions
 
 , in 1
 
 The Oxford Encyclopedia of American Military and Diplomatic History
 
 414 (Timothy J. Lynch ed., 2013). The Geneva Conventions have been signed and ratified by every country in the world, including the United States.
 

 Id.
 

 The Conventions therefore have the force of law in the United States. U.S. Const. art. VI, cl. 2.
 

 Article 2 of each of the Geneva Conventions renders the full protections of the Conventions, including combatant immunity, applicable only in international armed conflicts between signatories of the Conventions. Third Geneva Convention, art. 2. ("[T]he present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties"). If Article 2 is applicable, then the Third Geneva Convention provides that lawful combatants who are captured in such a conflict are considered prisoners of war (POWs). The categories of combatants qualifying as lawful are listed in Article 4 of the Convention. Two of these categories are relevant in this case:
 

 A. Prisoners of war, in the sense of the present Convention, are persons belonging to one of the following categories, who have fallen into the power of the enemy:
 

 (1) ....
 

 (2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil the following conditions: (a) that of being commanded by a person responsible for his subordinates;
 

 (b) that of having a fixed distinctive sign recognizable at a distance;
 

 (c) that of carrying arms openly;
 

 (d) that of conducting their operations in accordance with the laws and customs of war.
 

 (3) Members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power.
 

 Id.
 

 art. 4(A)(2)-(3). Under the Convention, POWs are granted combatant immunity.
 
 [2]
 

 See
 
 id.
 

 art. 87 (stating that POWs "may not be sentenced ... to any penalties except those provided for in respect of members of the armed forces of the [detaining] Power who have committed the same acts");
 

 id.
 

 art. 102 ("A prisoner of war can be validly sentenced only if the sentence has been pronounced by the same courts according to the same procedure as in the case of members of the armed forces of the Detaining Power, and if, furthermore, the provisions of the present Chapter have been observed."). If there is doubt as to whether a captured combatant is a lawful combatant and thus entitled to POW status, Article 5 of the Convention requires that the captured person be treated as a POW until their status is determined by a "competent tribunal."
 

 Id.
 

 art. 5 ("Should any doubt arise ... such persons shall enjoy the protection of the [Third Geneva] Convention until such time as their status has been determined by a competent tribunal."). The text of the Convention is silent as to what qualifies as a competent tribunal.
 

 When a conflict is not an international conflict between Geneva Convention signatories, at least one article of the Geneva Conventions still applies. Article 3 of each Convention provides that in an "armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum," certain provisions, including protecting "[p]ersons taking no active part in the hostilities," and refraining from "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."
 

 Id.
 

 art 3;
 
 see also
 

 Hamdan v. Rumsfeld
 
 ,
 
 548 U.S. 557
 
 , 629-30,
 
 126 S.Ct. 2749
 
 ,
 
 165 L.Ed.2d 723
 
 (2006). Thus, Article 3 allows for combatants captured during non-international conflicts to face trial and judgment for their actions as long as they are tried in the opposing force's country's "regularly constituted court."
 

 Id.
 

 ;
 
 see also
 
 1 Int'l Comm. of Red Cross (ICRC),
 
 Customary International Humanitarian Law
 
 354-55 (2005) (stating
 that pursuant to Article 3 of the Third Geneva Convention, captured combatants can be sentenced in a "regularly constituted court" that is "established and organised in accordance with the laws and procedures already in force in a country.")
 
 [3]
 
 .
 

 The Supreme Court has determined that Article 2 of the Third Geneva Convention applies when a conflict "involve[s] a clash between nations," whereas Article 3 "affords some minimal protection, falling short of full protection under the Conventions, to individuals associated with neither a signatory nor even a nonsignatory 'Power' who are involved in a conflict."
 
 See
 

 Hamdan
 
 ,
 
 548 U.S. at 628-29
 
 ,
 
 126 S.Ct. 2749
 
 (discussing the conflict in Afghanistan between the U.S. and al-Qaeda and applying Article 3).
 
 See also
 
 ICRC,
 
 Commentary on the Additional Protocols to the Geneva Conventions of 12 August 1949
 
 1350-51 (1987) (discussing the Conventions' distinction between international and non-international conflicts and explaining that "in a non-international armed conflict the legal status of the parties involved in the struggle is fundamentally unequal. Insurgents (usually part of the population), fight against the government in power").
 

 Here, Hamidullin claims that he cannot be tried in a United States criminal court because he is a POW entitled to combatant immunity under the Third Geneva Convention. We now turn to that inquiry.
 

 III.
 

 As a threshold matter, we must consider whether the district court had jurisdiction
 
 [4]
 
 to decide in the first instance whether Hamidullin qualified as a POW under the Third Geneva Convention, or whether Army Regulation 190-8 requires that his status first be determined by a military tribunal.
 

 Army Regulation 190-8 controls the Army, Navy, Air Force, and Marine Corps approach to the treatment and care of enemy prisoners of war and other detainees. Army Reg. 190-8, i. The regulation articulates a general policy that "[a]ll persons taken into custody by U.S. forces will be provided with the protections of the [Third Geneva Convention],"
 
 id.
 
 1-5(a)(2), and that "[i]n accordance with Article 5 [of the Convention], if any doubt arises as to whether a person ... belongs to any of the categories enumerated in Article 4, ... such persons shall enjoy the protection of the [Third Geneva] Convention until such time as their status has been determined by a competent tribunal,"
 
 id.
 
 1-6(a). Army Regulation 190-8 further states:
 

 A competent tribunal shall determine the status of
 
 any
 
 person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.
 

 Id.
 
 1-6(b) (emphasis added). Army Regulation 190-8 defines a competent tribunal as a tribunal "composed of three commissioned officers."
 
 Id.
 
 1-6(c).
 

 Hamidullin argues that Army Regulation 190-8 limits the ability of Article III courts to hear criminal claims against him. He contends that, like in the context of the federal prosecution of juveniles and hate crimes, when the Attorney General must make a certification to the district court demonstrating the unavailability or inappropriateness of state court prosecution prior to federal prosecution, the government must comply with Army Regulation 190-8 prior to proceeding with the criminal prosecution of captured combatants.
 
 See
 

 18 U.S.C. § 5032
 
 ;
 
 18 U.S.C. § 249
 
 (b). He asserts that Army Regulation 190-8 requires that any doubt about the applicability of combatant immunity to captured combatants be resolved in the first instance by a competent tribunal composed of three military officers. Because no such tribunal determined his status, Hamidullin contends that he is immune from criminal prosecution in civilian court and should be remanded to the custody of the U.S. military. This argument is unpersuasive.
 

 A.
 

 Army Regulation 190-8's general implementation of the Third Geneva Convention does not impact the district court's jurisdiction in this case. Army Regulation 190-8 confirms that persons taken into custody by U.S. forces will be provided Geneva Convention protections. The regulation implements Article 5 of the Convention and provides that if there is doubt as to whether a detained person is a POW, as defined by the Third Geneva Convention, the detainee "shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal." Army Reg. 190-8, 1-6(a). Critically, however, Army Regulation 190-8, in implementing Article 5, is also restricted by Article 5's applicability. Article 2 of the Convention provides that the Article 5 determination of POW status by a competent tribunal is only applicable in cases of international armed conflict between Convention signatories. Consequently, Army Regulation 190-8, by its own terms, only provides that POW status is determined by a competent tribunal in cases of international armed conflict. We conclude, however, that at the time of Hamidullin's offense, the conflict in Afghanistan was not an international armed conflict, and therefore that the Army Regulation 190-8 and the Article 5 requirement that POW status be determined by a competent tribunal does not apply.
 

 The conflict in Afghanistan began in 2001 as an international armed conflict arising between two or more Third Geneva Convention signatories-it was a conflict between the United States and its coalition partners on one side, and the Taliban-controlled Afghan government on the other.
 
 See
 
 J.A. 265-66. Shortly thereafter, in 2002, the Taliban lost control of the government and was replaced by a government led by Hamid Karzai.
 
 See
 
 J.A. 270. The United States and its coalition partners remained in Afghanistan at the request of this new government, assisting it in combating the continued Taliban insurgency. J.A. 311-12. Thus, by 2009, the conflict in Afghanistan had shifted from an international armed conflict between the United States and the Taliban-run Afghan government to a non-international armed conflict against unlawful Taliban insurgents.
 

 The Pictet Commentary, which the Supreme Court has found instructive in interpreting the Third Geneva Convention in
 
 Hamdan
 
 ,
 
 548 U.S. at 619-20
 
 ,
 
 126 S.Ct. 2749
 
 , supports the conclusion that in 2009, the conflict in Afghanistan was non-international. The Pictet Commentary explains that Article 4(A)(3) of the Convention, which defines POWs to include "[m]embers
 of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power," Third Geneva Convention, art. 4(A)(3), was a response to the refusal of certain states to recognize the combatant immunity of French followers of General Charles de Gaulle fighting during World War II, ICRC,
 
 Commentary to Geneva Convention III Relative to the Treatment of Prisoners of War
 
 62 (J. Pictet ed., 1960) ("[Article 4] must be interpreted, in the first place, in the light of the actual case which motivated its drafting-that of the forces of General de Gaulle which were under the authority of the French National Liberation Committee."). Article 4(A)(3) was drafted to afford POW protections to combatants who, like the Free French led by General de Gaulle, continued to engage in armed conflict even after a new government had been installed in their country and reached an armistice with a once-adversary.
 
 Id.
 
 at 61-63. However, Article 4(A)(3) is not without limit; indeed, the drafters of the Third Geneva Convention feared that an overly broad interpretation of Article 4(A)(3) would be "open to abusive interpretation" and lead "to the formation of armed bands."
 
 Id.
 
 at 62, 63. The Pictet Commentary, therefore, makes clear that the installation of a new government by an invading power is not enough to convert a conflict from international to non-international. Rather, some level of international recognition is required for the conflict to remain an "international armed conflict."
 
 Id.
 
 at 63 ("It is not expressly stated that this Government or authority must, as a minimum requirement, be recognized by third States, but
 
 this condition is consistent with the spirit of the provision
 
 , which was founded on the specific case of the forces of General de Gaulle." (emphasis added) ). In the case of the Free French, the ousted government led by General de Gaulle was recognized by the Allied forces. Conversely, by the time Hamidullin was captured, the Taliban had been removed from power for eight years and
 
 no
 
 country recognized the Taliban as the legitimate government of Afghanistan. J.A. 275-76 (explaining that the last country recognizing the Taliban government withdrew its recognition within months of 9/11). Thus, the Pictet Commentary suggests that in 2009, the conflict in Afghanistan was a non-international armed conflict for the purposes of the Convention.
 

 The International Committee of the Red Cross and the executive branch of the United States government have reached this same conclusion.
 
 See
 
 ICRC,
 
 International Humanitarian Law and the Challenges of Contemporary Armed Conflicts
 
 10 (2011) ("As the armed conflict does not oppose two or more states, i.e. as all the state actors are on the same side, the conflict must be classified as non-international, regardless of the international component, which can at times be significant. A current example is the situation in Afghanistan (even though that armed conflict was initially international in nature)."); ICRC,
 
 International Humanitarian Law and the Challenges of Contemporary Armed Conflicts
 
 7 (2007) ("This conflict [against the Taliban and Al-Qaeda] is non-international ... because it is being waged with the consent and support of the respective domestic authorities and does not involve two opposed States.");
 
 see also
 
 The White House,
 
 Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations
 
 19, 32 (2016) (stating that the United States is currently engaged only in non-international armed conflicts). Common sense agrees. If the conflict in Afghanistan was originally an international armed conflict occurring between two "High Contracting Parties"-the United States and the Afghan government-the
 conflict cannot remain international when the conflict between the recognized Afghan government and the United States has ceased. Accordingly, the provision in Army Regulation 190-8 directing that POW status be determined in accordance with Article 5 is inapplicable, and Hamidullin's argument that these provisions require a competent tribunal to determine his POW status must fail.
 

 Instead, because we conclude that the conflict in Afghanistan was non-international at the time of Hamidullin's offense, the protections of Article 3 of the Convention apply. Under Article 3, however, there is no provision entitling combatants captured during non-international conflicts to POW status or the resulting combatant immunity. Therefore, there is no process by which Hamidullin is entitled to a determination of whether he is a POW, as no POW status exists under Article 3, and, consequently, combatant immunity cannot be granted.
 

 Pursuant to Article 3, Hamidullin can be sentenced in a "regularly constituted court" that is "established and organised in accordance with the laws and procedures already in force in a country." 1 ICRC,
 
 Customary Int'l Humanitarian Law
 
 355 (2005) (interpreting Third Geneva Convention, art. 3). A U.S. federal district court is one such court.
 
 See
 

 18 U.S.C. § 3231
 
 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.");
 
 Hamdan
 
 ,
 
 548 U.S. at 632, 635
 
 ,
 
 126 S.Ct. 2749
 
 (clarifying that "Article 3 [of the Conventions] ... tolerates a great degree of flexibility in trying individuals captured during armed conflict; its requirements are general ones, crafted to accommodate a wide variety of legal systems"). Thus, the district court had jurisdiction to adjudicate Hamidullin's case irrespective of Army Regulation 190-8's invocation of Article 5 of the Convention.
 

 B.
 

 Hamidullin also argues that Army Regulation 190-8's statement that "[a] competent tribunal shall determine the status of
 
 any
 
 person not appearing to be entitled to prisoner of war status ... who asserts that he or she is entitled to treatment as a prisoner of war" entitles him to a competent tribunal regardless of whether the 2009 conflict was international.
 
 Id.
 
 1-6(b) (emphasis added). We disagree.
 

 To be sure, military regulations have the force of law.
 
 Standard Oil Co. of Cal. v. Johnson
 
 ,
 
 316 U.S. 481
 
 , 484,
 
 62 S.Ct. 1168
 
 ,
 
 86 L.Ed. 1611
 
 (1942) ("War Department regulations have the force of law.");
 
 United States v. Eliason
 
 , 41 U.S. (16 Pet.) 291, 302,
 
 10 L.Ed. 968
 
 (1842) ("[R]ules and orders publicly promulged [sic] through [the secretary of war] must be received as the acts of the executive, and as such, be binding upon all within the sphere of his legal and constitutional authority."). However, both the Supreme Court and this Court have made clear that military law does not govern our Article III jurisprudence.
 
 See
 

 United States v. Rendon
 
 ,
 
 607 F.3d 982
 
 , 990 (4th Cir. 2010) ("[M]ilitary law 'is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment.' " (quoting
 
 Burns v. Wilson
 
 ,
 
 346 U.S. 137
 
 , 140,
 
 73 S.Ct. 1045
 
 ,
 
 97 L.Ed. 1508
 
 (1953) ) ). Consequently, a regulation such as Army Regulation 190-8, 1-6(b), cannot preclude district court jurisdiction when doing so contravenes Congress's grant of jurisdiction to the judiciary.
 

 Hamidullin's interpretation of Army Regulation 190-8, 1-6(b), would allow an internal executive branch regulation to strip Article III courts of their statutorily
 granted jurisdiction. At the time of his trial, Hamidullin was in civilian custody and under indictment for civilian crimes over which Congress has granted exclusive jurisdiction to Article III district courts.
 
 See
 

 18 U.S.C. § 3231
 
 . During his civilian criminal proceeding Hamidullin raised a defense-combatant immunity-that is inextricably tied up in questions of treaty interpretation. This defense does not deprive the district court of its authority to hear Hamidullin's case, as there can be no question that it is the role of the judiciary, not the executive, to interpret treaties. To quote the Supreme Court in
 
 Sanchez-Llamas v. Oregon
 
 :
 

 Under our Constitution, "[t]he judicial Power of the United States" is "vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Art. III, § 1. That "judicial Power ... extend[s] to ... Treaties."
 

 Id.
 

 § 2. And, as Chief Justice Marshall famously explained, that judicial power includes the duty "to say what the law is."
 
 Marbury v. Madison
 
 , 5 U.S. (1 Cranch) 137, 177 [
 
 2 L.Ed. 60
 
 ] (1803). If treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law "is emphatically the province and duty of the judicial department," headed by the "one supreme Court" established by the Constitution.
 

 Id.
 

 ; see also
 
 Williams v. Taylor
 
 ,
 
 529 U.S. 362
 
 , 378-379 [
 
 120 S.Ct. 1495
 
 ,
 
 146 L.Ed.2d 389
 
 ] (2000) (opinion of Stevens, J.) ("At the core of [the judicial] power is the federal courts' independent responsibility-independent from its coequal branches in the Federal Government, and independent from the separate authority of the several States-to interpret federal law").
 

 548 U.S. 331
 
 , 353-54,
 
 126 S.Ct. 2669
 
 ,
 
 165 L.Ed.2d 557
 
 (2006). Determining the meaning of the Third Geneva Convention as a matter of federal law "is emphatically the province and duty of the judicial department,"
 
 Marbury
 
 , 5 U.S. (1 Cranch) at 177, and remanding this case to the executive branch to determine the Convention's meaning and applicability to Hamidullin in the first instance would be an abdication of "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them."
 
 Colo. River Water Conservation Dist. v. United States
 
 ,
 
 424 U.S. 800
 
 , 817,
 
 96 S.Ct. 1236
 
 ,
 
 47 L.Ed.2d 483
 
 (1976).
 

 Of course, the executive may engage in the interpretation of treaties in order to implement them into its own internal procedures and regulations. Such interpretations are "entitled to great weight" and can inform the judiciary's own interpretations.
 
 Abbott v. Abbott
 
 ,
 
 560 U.S. 1
 
 , 15,
 
 130 S.Ct. 1983
 
 ,
 
 176 L.Ed.2d 789
 
 (2010) (discussing the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 24, 1980, T.I.A.S. No. 11670);
 
 see also
 

 Sumitomo Shoji Am., Inc. v. Avagliano
 
 ,
 
 457 U.S. 176
 
 , 184-85,
 
 102 S.Ct. 2374
 
 ,
 
 72 L.Ed.2d 765
 
 (1982). Here, the Executive Branch has used Army Regulation 190-8 to implement the protections of the Third Geneva Convention. Additionally, the executive has explicitly expressed its interpretation of the Third Geneva Convention with regards to the Taliban. In 2002, when the conflict in Afghanistan was still considered an international armed conflict and, thus, Article 4 of the Convention applied to determine whether a combatant qualified as a POW, President George W. Bush determined that Taliban detainees did not qualify as POWs because they were unlawful combatants. Memorandum of President George W. Bush to the Vice President, et. al. (Feb. 7, 2002);
 
 see also
 

 Hamdan v. Rumsfeld
 
 ,
 
 415 F.3d 33
 
 , 43 (D.C. Cir. 2005),
 
 rev'd on other grounds
 
 ,
 
 548 U.S. 557
 
 ,
 
 126 S.Ct. 2749
 
 ,
 
 165 L.Ed.2d 723
 
 (2006) ("The President found that
 Hamdan was not a prisoner of war under the Convention. Nothing in [Army Regulation 190-8], and nothing [petitioner] argues, suggests that the President is not a 'competent authority' for these purposes.").
 

 Hamidullin asks us to provide a three-member military tribunal with the authority to displace the president's interpretation of the Convention. In arguing that Army Regulation 190-8, 1-6(b) applies even if at the time of his offense the conflict in Afghanistan was non-international, Hamidullin requests that we remand him to military custody to allow a tribunal to determine whether the Third Geneva Convention provides him with combatant immunity. This will necessarily involve a reconsideration of President Bush's interpretation of the Convention, as the Convention only extends combatant immunity to combatants involved in international armed conflicts. Accordingly, Hamidullin not only asks this Court to abdicate our duty to decide cases properly within our jurisdiction, but also asks us to ignore the legal determination already made by the President of the United States, and to instead authorize a panel of three mid-level, non-lawyer military officers to usurp our authority and responsibility.
 
 See
 
 Status of Taliban Forces Under Article 4 of the Third Geneva Convention of 1949,
 
 26 Op. O.L.C. 1
 
 , 9 (2002). (stating that Article 5 "[t]ribunals are ... designed to determine whether a particular set of facts falls within one of the Article 4 categories; they are not intended to be used to resolve the proper interpretation of those categories."). Moreover, remanding this case to a military tribunal to make a legal determination that the Commander-in-Chief has already made could lead to an inconsistent application of the laws of war, would undermine the United States and its partners' current application of the legal framework for non-international armed conflicts in Afghanistan, and, perhaps most troubling, would violate separation of powers principles by conferring our responsibility to hear cases properly within our jurisdiction upon a three-member military tribunal.
 
 [5]
 
 We cannot allow Hamidullin's interpretation of Army Regulation 190-8 to upend our system of governance. It is the responsibility of this Court-not of a three-member panel of military officers-to decide the lawfulness of the executive's interpretation.
 
 See
 

 Sanchez-Llamas
 
 , 548 U.S. at 353-54,
 
 126 S.Ct. 2669
 
 .
 
 [6]
 

 Consequently, we conclude that the district court had jurisdiction to determine whether Hamidullin qualifies as a POW and was entitled to combatant immunity under the Convention, irrespective of Army Regulation 190-8. We therefore decline to remand Hamidullin to military custody, and turn to the merits of his combatant immunity defenses.
 

 IV.
 

 Hamidullin argues he is entitled to combatant immunity pursuant to the Third Geneva Convention and common law. We review the district court's factual findings for clear error, and its legal determinations de novo.
 
 United States v. Washington
 
 ,
 
 398 F.3d 306
 
 , 310 (4th Cir. 2005).
 

 A.
 

 To be entitled to combatant immunity, the Third Geneva Convention requires that a combatant (1) be captured during an international armed conflict, Third Geneva Convention, art. 2, and (2) be a lawful combatant-in other words, the combatant must belong to one of the Article 4 categories defining POW's,
 

 id.
 

 art. 4. Article 4 lists six categories of lawful combatants, but only two categories, Article 4(A)(2) and (A)(3), are relevant here. Article 4(A)(2) provides that members of militias belonging to a party to the conflict are lawful combatants entitled to POW status so long as they are commanded by a person responsible for subordinates, carry a "fixed distinctive sign," carry arms openly, and operate in accordance with the laws of war.
 

 Id.
 

 art. 4(A)(2). Article 4(A)(3) provides that "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power" are likewise POWs.
 

 Id.
 

 art. 4(A)(3).
 

 Below, the district court assumed, without deciding, that the conflict in Afghanistan in 2009 was international and determined that neither the Taliban nor the Haqqani Network fit into an Article 4 category. It held that the Taliban and Haqqani Network most closely resembled a "militia" or "organized resistance movement" as described in Article 4(A)(2), but that neither organization fulfilled the criteria of Article (4)(2). Specifically, the district court found that neither organization has a fixed, distinctive sign recognizable at a distance, carries arms openly, or conducts operations in accordance with the laws and customs of war.
 
 See
 
 id.
 

 art. 4(A)(2).
 
 [7]
 

 Hamidullin does not identify a clear error in the district court's factual findings, and makes no claim that the Taliban satisfy the criteria set forth in Article 4(A)(2). Instead, he contends he is entitled to POW status under Article 4(A)(3), which covers "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power."
 

 Id.
 

 art. 4(A)(3). Unlike the criteria for militia in Article 4(A)(2), Article 4(A)(3) contains no conditions that groups must fulfill in order to be entitled to POW status; membership in a regular armed force expressing allegiance to a government not recognized by the detaining power is the only enumerated requirement. Hamidullin
 contends that because the Third Geneva Convention does not expressly incorporate the Article 4(A)(2) criteria into Article 4(A)(3), he is entitled to POW status regardless of whether the Taliban satisfies the Article 4(A)(2) criteria.
 

 The difficulty with Hamidullin's argument is that, as discussed above, we hold that the conflict in Afghanistan was not an international armed conflict. As a result, irrespective of whether Taliban fighters are entitled to POW status pursuant to Article 4(A)(3), Hamidullin is not entitled to combatant immunity because the protections of Article 3 (governing non-international conflicts), rather than Article 2 (governing international conflicts), apply. Article 3 only requires that Hamidullin be tried "by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Third Geneva Convention, art. 3. The U.S. federal district courts are "established and organised in accordance with the laws and procedures already in force" in the United States.
 
 See
 
 1 ICRC,
 
 Customary International
 

 Humanitarian Law
 
 355 (2005);
 
 18 U.S.C. § 3231
 
 . Accordingly, the district court did not err in determining that Hamidullin was properly tried in a regularly constituted American court.
 

 B.
 

 In the alternative, Hamidullin argues that even if he does not qualify for combatant immunity under the Third Geneva Convention, he is eligible for common law combatant immunity as an enemy soldier fighting for a rival sovereign. He frames this defense as a public authority defense, citing
 
 Dow v. Johnson
 
 and other post-Civil War jurisprudence.
 
 100 U.S. 158
 
 , 165,
 
 25 L.Ed. 632
 
 (1879) ("[F]rom the very nature of war, the tribunals of the enemy must be without jurisdiction to sit in judgment upon the military conduct of the officers and soldiers of the invading army.");
 
 see also
 

 Coleman v. Tennessee
 
 ,
 
 97 U.S. 509
 
 , 515,
 
 24 L.Ed. 1118
 
 (1879) ("Officers and soldiers of the armies of the Union were not subject during the war to the laws of the enemy, or amenable to his tribunals for offences committed by them."). Hamidullin argues that just as defendants who act in objectively reasonable reliance on the authority of a government official are immune from criminal liability,
 
 see
 

 United States v. Fulcher
 
 ,
 
 250 F.3d 244
 
 , 252-53 (4th Cir. 2001), soldiers in armed conflict are immune from criminal liability when they act by virtue of the direction of a belligerent party. Typically, however, the public authority defense looks to whether the defendant's actions were sanctioned by a U.S. official, as foreign officials do not have authority to authorize violations of U.S. criminal law.
 
 See
 
 1 Charles E. Torcia,
 
 Wharton's Criminal Law
 
 § 41 (15th ed. 2015) ("The fact that a crime committed in time of peace was committed under the directions of the authority of a foreign government is no defense."). Nonetheless, Hamidullin asserts that "immunity from ordinary criminal liability applies without distinction between soldiers who fight on behalf of a State and opposing forces who assert a rival claim to sovereign authority." Appellant Br. 35. We disagree.
 

 The Third Geneva Convention is the governing articulation of lawful combatant status. The principles reflected in the common law decisions cited by Hamidullin were refined and collected in 20th century efforts to codify the international law of war that resulted in the Third Geneva Convention. Just as a statute preempts common law when Congress speaks directly to the question,
 
 see e.g.
 
 ,
 
 City of Milwaukee v. Illinois & Michigan
 
 ,
 
 451 U.S. 304
 
 , 315,
 
 101 S.Ct. 1784
 
 ,
 
 68 L.Ed.2d 114
 
 (1981),
 a self-executing treaty like the Third Geneva Convention would similarly preempt common law if the treaty speaks directly to the question. The Third Geneva Convention explicitly defines the category of individuals entitled to POW status, and concomitantly, combatant immunity. Third Geneva Convention, art. 4. As such, the Third Geneva Convention's definition of lawful and unlawful combatants is conclusive.
 

 Moreover, Hamidullin's broad framing of common law combatant immunity would extend immunity far beyond the Third Geneva Convention, to every person acting on behalf of an organization that claims sovereignty. For example, it could supply a claim of immunity to terrorists operating on behalf of the Islamic State, which itself claims sovereignty. We decline to broaden the scope of combatant immunity beyond the carefully constructed framework of the Geneva Convention. The Convention represents an international consensus on the norms of treatment of prisoners, a consensus that would be eviscerated if common law principles were interpreted as superseding. Because Hamidullin does not qualify for combatant immunity pursuant to the Third Geneva Convention, he likewise does not qualify for the common law defense of public authority.
 

 V.
 

 Last, Hamidullin challenges his conviction for conspiring and attempting to destroy a U.S. military aircraft in violation of
 
 18 U.S.C. § 32
 
 (a). Section 32(a) states that "[w]hoever willfully-(1) sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States" shall be imprisoned not more than twenty years.
 
 18 U.S.C. § 32
 
 (a). The special jurisdiction of the United States includes "an aircraft of the armed forces of the United States" in flight.
 
 49 U.S.C. § 46501
 
 (2)(B). Section 32(b) criminalizes the damage or destruction of "civil aircraft registered in a country other than the United States." The district court held that the plain language of § 32(a) applies to unlawful acts even when committed in a combat zone.
 

 Hamidullin argues that Congress did not intend to apply § 32 to military personnel whose attacks on aircraft are accepted under the laws of armed conflict. To support this contention, he relies on a memorandum from the Office of Legal Counsel which analyzed § 32(b) and reasoned that § 32(b) should not be construed to "have the surprising and almost certainly unintended effect of criminalizing actions by military personnel that are lawful under international law." United States Assistance to Countries that Shoot Down Civil Aircraft Involved in Drug Trafficking,
 
 18 Op. O.L.C. 148
 
 , 164 (1994).
 

 We conclude that Hamidullin's argument fails because even Hamidullin's preferred construction of congressional intent does not preclude application of the statute in this case. He claims that Congress did not intend § 32 to apply to the actions of "military force" that are lawful under international law. However, as described above, Hamidullin was not a lawful combatant and his conduct was not lawful under the Third Geneva Convention. Hence, the district court did not err in determining that the plain language of § 32(a) applied to Hamidullin's conduct. Here, Hamidullin was convicted of attempting to fire anti-aircraft weapons at U.S. military helicopters. Given Hamidullin's status as an unlawful combatant, that attack falls under the plain language of
 
 18 U.S.C. § 32
 
 (a).
 

 * * *
 

 We do not take our duty to respect and comply with the tenets of international law lightly. This is especially true when, as
 here, our interpretation of that responsibility has the potential to seriously impact the treatment of persons captured during armed conflicts. Nonetheless, for the foregoing reasons, it is clear to us that neither the Third Geneva Convention nor U.S. Army regulations grant Hamidullin immunity from criminal prosecution in an Article III court. Moreover, the text of § 32(a) clearly applies to these facts. Accordingly, the judgment of the district court is
 

 AFFIRMED.
 

 The Third Geneva Convention governs the treatment of prisoners of war, whereas the First Geneva Convention addresses the treatment of wounded forces in the field, Geneva Convention for the Amelioration of the Condition of the Wounded in Armies in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31, the Second Geneva Convention addresses the treatment of wounded members of the armed forces at sea, Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85, and the Fourth Geneva Convention addresses the protection of civilians during wartime, Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287.
 

 To the extent they exist, any differences between lawful combatants and POWs are immaterial to our discussion here. Accordingly, for ease of reference, we use the terms POW and lawful combatant interchangeably.
 

 Although non-binding, the ICRC's interpretation of the Geneva Conventions has been treated as persuasive by the Supreme Court.
 
 Hamdan
 
 , 548 U.S. at 632,
 
 126 S.Ct. 2749
 
 .
 

 Pursuant to this Court's request for supplemental briefing, Hamidullin and the government use the term "jurisdiction" to describe the impact of Army Regulation 190-8 on Article III courts. However, Hamidullin does not argue that the district court lacked subject matter jurisdiction. Instead, he claims that there are prerequisite steps that the government ought to have completed prior to his criminal prosecution-in this case an Army Regulation 190-8 tribunal.
 

 Hamidullin responds that allowing a military tribunal to determine his status is consistent with the doctrine of primary jurisdiction. Primary jurisdiction is a prudential limit which takes advantage of agency expertise by allowing agencies to make determinations in the first instance when a case implicates issues not within the "conventional experience of judges."
 
 Envtl. Tech. Council v. Sierra Club
 
 ,
 
 98 F.3d 774
 
 , 789 (4th Cir. 1996). But it is inappropriate to invoke the doctrine of primary jurisdiction when the Commander-in-Chief has already answered the question Hamidullin seeks to submit to the Army.
 

 The dissent disagrees as to whether the Third Geneva Convention questions underlying Hamidullin's POW claim are properly decided by the courts or the executive in the first instance. Specifically, the dissent asserts that we should "remand this matter for the limited purpose of the Executive's consideration and explanation of Hamidullin's POW status," dissent at 33, and that "unless and until the Executive resolves his POW claim, Hamidullin should be treated in accordance with the Third Geneva Convention and Army Regulation 190-8,"
 
 id.
 
 at 70-71. Notwithstanding that this remand would place Hamidullin in limbo pending a determination from the executive that neither he nor the courts have the authority to compel, the dissent unconvincingly attempts to limit the judiciary's authority to interpret the Convention to reviewing the executive's interpretations. The executive certainly has the authority to clarify its position on the Convention questions underlying Hamidullin's claim and to deem him a POW-even outside of the Convention and Army Regulation 190-8. However, the judiciary likewise has the authority and the responsibility to interpret those documents, including reviewing whatever guidance the executive has provided, to resolve Hamidullin's claim.
 

 On appeal, Hamidullin does not argue that members of the Haqqani Network, a Taliban-affiliated group of militants that conducts insurgent activity in Afghanistan, qualify for combatant immunity under the Third Geneva Convention or common law. Accordingly, we address only the status of captured Taliban fighters.